## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 10 B 06420 |
| | ) | Chapter 7 |
| DANIEL J. ROBERTS and | ) | Judge John H. Squires |
| CANDICE M. ROBERTS, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| DAVID J. ZITT, | ) | |
| | ) | Adversary No. 10 A 01298 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL J. ROBERTS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the complaint filed by David J. Zitt (the "Creditor") to determine the dischargeability of an alleged debt against Daniel J. Roberts (the "Debtor") under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). For the reasons set forth herein, the Court finds that the Creditor has not demonstrated all of the requisite elements of the statutory exceptions by a preponderance of the evidence and, therefore, the debt is dischargeable.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

-2-

## II. FACTS AND BACKGROUND

The Debtor is a licensed architect in Illinois for approximately twenty-four years, and was the president of Prairie Design & Build, Inc. ("Prairie"), an Illinois corporation engaged in the business of real estate design and construction. The Debtor also served as a member of Roboh Futures, LLC ("Roboh"). Edward Bohan ("Bohan") was a member of Roboh and also served as vice president of Prairie and was its general business manager for nine years. The Creditor is a self-employed carpenter and contractor who had known the Debtor for approximately sixteen years and had performed carpentry subcontractor work for Prairie from time to time over fifteen years.

On April 5, 2001, The Gables of Hinsdale LLC ("the Gables") and Prairie entered into a general contractor agreement. (Debtor Ex. No. 7.) The agreement called for Prairie to serve as the Gables' general contractor and architect to construct townhouse units for the Gables' project, and set forth that Prairie would be paid a fee of 15% of the total construction cost and any costs related to the project. (*Id.*) On June 22, 2001, the Creditor and Prairie filed with the Illinois Secretary of State the Articles of Organization for the Gables. (Creditor Ex. No. 2.)

On July 5, 2001, the Creditor and Prairie executed an operating agreement (the "Operating Agreement") naming the Creditor and Prairie as members, each with a 50% interest in the Gables. (Creditor Ex. No. 3; Debtor Ex. No. 6) The Operating Agreement appointed the Debtor as manager of the Gables. (*Id.* § 4.6.) Bohan did not serve as a member of the Gables, but performed office and other functions such as maintaining its bank accounts. The Operating Agreement called for equal distributions to be paid to the Creditor

-3-

and Prairie upon closing on the sale of each townhouse after subtracting costs, expenses, and liabilities incurred by the Gables. (*Id.* § 3.4.)

On October 5, 2001, the Gables purchased a parcel of real estate located at 5727 S. Madison Street, Hinsdale, Illinois for $625,000, financed with an acquisition loan from Palos Bank and Trust Company ("Palos") in the amount of $675,000, which included additional lender fees and an interest reserve. (Creditor Ex. No. 5; Debtor Ex. No. 8.) The parcel was subdivided into six units in order to construct six townhouses.

On August 5, 2002, the Gables obtained a construction loan from State Bank of Countryside ("Countryside") in the amount of $2,364,000. (Debtor Ex. No. 13.) The proceeds of the Countryside loan were distributed as follows: $1,366,427.03 was made available for immediate use for construction; $970,140.47 was paid to Palos; $3,792.50 was paid for appraisal and other fees; and $23,640 was paid as a service charge.[1] (Debtor Ex. No. 14.) Of the $970,140.47 payment to Palos, $682,504.14 went to pay off the Gables' acquisition loan and $287,636.33 went to pay off two other projects for which Prairie was liable to Palos. The Debtor testified that the Creditor was aware of this distribution and agreed to treat the payment as a pre-payment for general contractor fees that Prairie would earn as general contractor for the Gables. The Creditor disputes this point. There is no documentation of such an agreement for a pre-payment of general contractor fees, and the

---

[1] In his written closing arguments, the Creditor continually asserts that Prairie received a disbursement from the Palos loan as an advance against its general contracting fee, (Creditor Closing Argument pp. 7, 9), but in fact it was a disbursement from the Countryside loan.

-4-

Creditor testified that he was never made aware of the arrangement and would not have consented if he had known.

On July 26, 2004, the Gables refinanced its construction loan by executing a Construction Loan Agreement for $3,206,094 with United Community Bank of Lisle (the "United Mortgage"). (Debtor Ex. No. 28.) The United Mortgage was personally guaranteed by the Creditor, the Debtor, and Bohan. (Creditor Ex. Nos. 15-17.) The proceeds of the United Mortgage were used to pay the pre-existing debt to Countryside and to pay closing fees, and the balance of $1,289,041.69 was made available for completing construction. (Debtor Ex. No. 30.)

Prairie hired subcontractors to construct the townhouse units but many problems delayed construction and completion, including cost overruns, basement flooding, and litigation with third parties. Prairie also hired legal counsel to defend a lawsuit filed by the purchaser of Unit 2, which resulted in substantial legal fees and $24,000 to settle the case. (Debtor Ex. Nos. 45, 53, & 62.) The Creditor testified that the Gables project was at a standstill for eight months while the parties attempted to obtain financing. Invoices from Prairie and its subcontractors totaled $4,073,277.52 in construction costs, which did not include the settlement or the majority of the attorneys' fees. (Creditor Ex. No. 36.) The Gables also paid hundreds of thousands of dollars in interest on the construction loans. (Debtor Ex. No. 46.)

-5-

Units 1 through 6 were sold between April 2004 and December 2006. The sales of those units and the disbursement of those proceeds are represented by the following chart:[2]

|  | Unit 1 | Unit 2 | Unit 3 | Unit 4 | Unit 5 | Unit 6 |
|---|---|---|---|---|---|---|
| Purchase Price | $699,630.00 | $810,925.00 | $780,461.29 | $770,900.00 | $750,900.00 | $703,654.08 |
| Mortgage | $669,118.75 | $610,318.78 | $737,629.26 | $733,465.95 | $725,478.59 | $625,781.58 |
| Settlement fees | $9,281.50 | $13,553.00 | $18,593.70 | $21,604.90 | $8,604.90 | $7,914.50 |
| Taxes/other fees | $1,229.75 | $3,955.55 | $4,238.33 | $829.15 | $1,816.51 | $35,007.91 |
| Realtor's fees | $13,980.00 | $15,000.00 | $10,783.50 | $15,000.00 | $15,000.00 | |
| | | | | | | |
| Remaining balance | $6,020.00 | $168,097.67 | $9,216.50 | $0.00 | $0.00 | $34,950.09 |

Thus, the Gables generated $218,284.26 in net sales proceeds from its venture, before adjustments for capital contributions of its members–the Creditor and Prairie.

On July 10, 2006, the Creditor contributed $280,000 to the Gables, represented as a $279,245 principal payment on the Gables' construction loan with United. (Debtor Ex. No. 46.) Prairie's contribution was funded by the Debtor. The Debtor requested a $600,000 home equity loan on his residence from United. (Debtor Ex. No. 93.) United applied $173,868.89 of the home equity loan toward the Gables' construction loan and an additional $6,131.11 toward interest on the loan. (Debtor Ex. No. 46.) The balance of $419,283 was deposited into the Gables' checking account. (Debtor Ex. No. 45.) Three checks were then written out of that account. Check number 1008 for $198,616.44 was issued to Al Hank, an investor in Roboh. (*Id.*) Check number 1012 for $116,183.56 was issued to Roboh and

---

[2] The chart was constructed based on information from the Creditor's Exhibit No. 43 and the Debtor's Exhibit Nos. 46, 69, 75, 76, 77, 80, 82, 84, 86, 87, and 89.

-6-

check number 1011 for $5,200 was issued to the Debtor. (*Id.*) The Debtor did not sign the first two checks, but did sign the third check for $5,200. (*Id.*) After deducting the checks from the Debtor's home equity deposit, $99,283 remained. Adding this to the amount applied against the United Mortgage, Prairie's contribution to the Gables totals $279,283.

According to both Bohan and the Debtor's testimony, the Gables was never profitable so there were no profits to split between Prairie and the Creditor. (*See* Debtor Ex. Nos. 33-41.) The Debtor testified that the tax returns filed for the Gables were true and correct to his knowledge, and that as manager for the Gables he never took any compensation for such services he rendered. According to the Debtor, the interest paid on the Gables' construction loans aggregated approximately $600,000-$800,000. In addition, the downturn in the economy and the recent recession in the local real estate market contributed to the lack of profits on the subject project. The closing statements for the sales of the six units of the Gables shows little or no net cash to the Gables as seller. (Debtor Ex. Nos. 75, 77, 78, 80, 81, 84, 85, 87, 88, 89, & 90.) Some net proceeds went to Prairie and were used to pay bills, but none of those proceeds were distributed to either the Debtor, his wife Candice M. Roberts ("Candice"), or Bohan.

The Debtor filed a joint Chapter 7 bankruptcy with Candice on February 18, 2010. The Creditor commenced this adversary proceeding on June 14, 2010 to determine the dischargeability of an alleged debt owed to him by the Debtor. Count I of the complaint asserts an exception to discharge under 11 U.S.C. § 523(a)(2)(A) for false pretenses, false representation, or actual fraud. Count II, mistakenly styled as Count III, asserts an exception to discharge under 11 U.S.C. § 523(a)(6) for willful and malicious injury. In his written

-7-

closing arguments, the Creditor moves to amend the complaint to conform to the evidence presented at trial to strike Count II and include a claim under 11 U.S.C. § 523(a)(4) which provides an exception to discharge for a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

## III.  APPLICABLE STANDARDS

### A.     Exceptions to the Discharge of a Debt

The discharge provided by the Bankruptcy Code is meant to effectuate the fresh start goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995). The United States Supreme Court has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991); *see also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000); *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 972-73 (7th Cir. 1998). "[Section 523(a)] is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001). An allegation of fraud against an agent of an entity can be the basis of a dischargeability action against the agent. *See Hemelt v. Pontier*

-8-

*(In re Pontier)*, 165 B.R. 797, 799 (Bankr. D. Md. 1994).  After all, "[a]gents are liable for

their own torts."  *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 46

(7th Cir. 1994); *see also Miller v. Simon*, 241 N.E.2d 697, 700, 799 (Ill. App. Ct. 1968)

(finding that agents are personally liable for torts they commit even though performed in the

name of an artificial entity).

**B.**   **11 U.S.C. § 523(a)(2)(A)**

Section 523 of the Code enumerates specific, limited exceptions to the

dischargeability of debts.  Among them, section 523(a)(2)(A) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt–
>
> . . .
>
> (2) for money, property, services, or an
> extension, renewal, or refinancing of credit, to
> the extent obtained by–
> > (A) false pretenses, a false
> > representation, or actual fraud,
> > other than a statement
> > respecting the debtor's or an
> > insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).   Section 523(a)(2)(A) lists three separate grounds for

dischargeability:  false pretenses, false representation, and actual fraud.  *Id.*; *Bletnitsky v.

Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001).

**1. False Pretenses or False Representation**

In order to except a debt from discharge based on false pretenses or false

representation, the creditor must establish the following elements:  (1) the debtor made a

false representation or omission of fact; (2) that the debtor (a) either knew to be false or made

-9-

with reckless disregard for its truth and (b) made with an intent to deceive; and (3) the creditor justifiably relied on the false representation. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *Wallner v. Liebl (In re Liebl)*, 434 B.R. 529, 538 (Bankr. N.D. Ill. 2010); *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 643 (Bankr. N.D. Ill. 2004). To prevail on a § 523(a)(2)(A) complaint, all three elements must be established. *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one element is outcome determinative. *Jairath*, 259 B.R. at 314.

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). The Court has defined false pretenses as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....
>
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (internal quotation omitted); *see also John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 872 (Bankr. N.D. Ill. 2004) (*quoting Paneras*).

-10-

False pretenses do not require overt misrepresentations. *Sarama*, 192 B.R. at 928. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.*; *see also Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005) (finding that "[s]ilence or concealment may constitute false pretenses"); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002) (same).

In contrast, a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or though conduct. *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002); *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002). "A debtor's silence regarding a material fact [also] can constitute a false representation under § 523(a)(2)(A)." *Trs. of the Operating Eng'rs Local No. 965 Health Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007). Failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression. *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992). "A contractor's false affidavit certifying that subcontractors and materialmen have been paid and that there are no mechanic's or materialmen's liens against the property when in fact such subcontractors have not been paid may . . . result in a nondischargeable debt under § 523(a)(2)(A)." *Cripe v. Mathis (In re Mathis)*, 360 B.R. 662, 667 (Bankr. C.D. Ill. 2006).

-11-

## 2. Actual Fraud

The Seventh Circuit Court of Appeals has defined the term "fraud" for purposes of § 523(a)(2)(A) as follows:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (internal quotation omitted). "Actual fraud" is not limited to misrepresentation but may encompass "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *Id.* (internal quotation omitted). Hence, a different analysis from misrepresentation must be utilized when a creditor alleges actual fraud. *Id.* at 893-94. The *McClellan* court opined that because common law fraud does not always take the form of a misrepresentation, a creditor need not allege misrepresentation and reliance thereon to establish a cause of action for actual fraud under § 523(a)(2)(A). *Id.* at 894. Rather, the creditor must prove that: (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt at issue. *Id.*; *Liebl*, 434 B.R. at 538. The fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones. *McClellan*, 217 F.3d at 894. The existence of fraud may be inferred if the totality of the circumstances presents a "picture of deceptive conduct" by the debtor which indicates that he intended to deceive or cheat the creditor. *Mathis*, 360 B.R. at 666; *Sielschott*, 332 B.R. at 572.

-12-

### 3. Intent

Any cause of action under § 523(a)(2)(A)–false pretenses, false representation, or actual fraud– requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Proof of intent is measured by the debtor's subjective intention at the time the representation was made. *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004); *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003). It is well established, however, that courts can consider subsequent conduct if that conduct provides an indication of the debtor's state of mind at the time of the actionable representation. *6050 Grant, LLC v. Hanson (In re Hanson)*, 437 B.R. 322, 327-28 (Bankr. N.D. Ill. 2010) (collecting cases), *aff'd*, No. 10 C 7634, slip op. (N.D. Ill. July 18, 2011).

Deciding whether a debtor had the requisite intent under § 523(a)(2)(A) is, therefore, a factual, subjective inquiry determined by examining all of the relevant circumstances, including those that took place after the debt was incurred. *Id.* at 328; *see also Sears, Roebuck & Co. v. Green (In re Green)*, 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003). Because a debtor will rarely, if ever, admit to acting with an intent to defraud, the scienter element may be inferred from the surrounding circumstances. *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera)*, 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1020 (Bankr. N.D. Ill. 1996). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

-13-

### 4. Justifiable Reliance

The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on a false pretense, a false representation, or actual fraud under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (internal quotation omitted). An intermediate level of reliance, justifiable reliance falls somewhere between the more stringent "reasonable reliance" guidepost and the more lenient "reliance in fact." *Id.* at 73-75.

The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent. *Id.* at 70-72. Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by using an objective standard. *Id.* at 71; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (*quoting Field*, 516 U.S. at 70). "However, a 'plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods.'" *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (*quoting Zirkel v. Tomlinson (In re Tomlinson)*, Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *12 (Bankr. N.D. Ill. May 10, 1999)).

-14-

To satisfy the reliance element of § 523(a)(2)(A), the creditor must establish that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor seeks to have excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation with causation in fact."). *See also Westfall*, 379 B.R. at 805 (*citing Mayer*).

### C.    11 U.S.C. § 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). The meaning of these terms is a question of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003). In order for a creditor to prevail under § 523(a)(4), he must prove that a debtor committed (1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement; or (3) larceny. 11 U.S.C. § 523(a)(4). The Creditor does not specify which theory he is proceeding under so the Court will discuss each one in turn.

### 1.  Fraud or Defalcation

A creditor's debt may be found nondischargeable under the fraud or defalcation prong of § 523(a)(4) if he is able to establish that: (1) an express trust or fiduciary relationship existed between him and the debtor; and (2) the debtor committed fraud or defalcation in the course of that relationship. *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996); *Monroe*, 304 B.R. at 358. "Fraud" for purposes of this exception has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud. *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 477 (Bankr. N.D. Ill. 2011); *Mut. Mgmt. Servs., Inc. v. Fairgrieves*

-15-

*(In re Fairgrieves)*, 426 B.R. 748, 754 (Bankr. N.D. Ill. 2010). "Defalcation" is not a defined

term in the Bankruptcy Code.   One court has defined defalcation within the context of §

523(a)(4) as "the misappropriation of trust funds held in any fiduciary capacity, and the

failure to properly account for such funds." *Strube Celery & Vegetable Co., Inc. v. Zois* (*In*

*re Zois*), 201 B.R. 501, 506 (Bankr. N.D. Ill. 1996) (internal quotation omitted); *see also*

*Blackhawk B.M.X., Inc. v. Anderson* (*In re Anderson*), 64 B.R. 331, 334 (Bankr. N.D. Ill.

1986). Defalcation has also been defined as " a failure to account for money or property that

has been entrusted to another." *Green v. Pawlinski* (*In re Pawlinski*), 170 B.R. 380, 389

(Bankr. N.D. Ill. 1994).   An objective standard is used to determine defalcation, and intent

or bad faith is not required. *Id.* Mere negligence does not constitute defalcation.  *Meyer v.*

*Rigdon*, 36 F.3d 1375, 1382-85 (7th Cir. 1994) (construing defalcation under §§ 523(a)(4)

and 523(a)(11)).   That is, although the Seventh Circuit has not clearly defined the level of

tortious conduct necessary to constitute defalcation in the context of § 523(a)(4), it has

required something more than mere negligence or mistake, but less than fraud. *Id.* at 1385;

*Kress v. Kusmierek* (*In re Kusmierek*), 224 B.R. 651, 656-57 (Bankr. N.D. Ill. 1998).  Some

degree of culpability is required to make a debt non-dischargeable as defalcation under §

523(a)(4), *see Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511-12 (2d Cir.

1937), and a debtor's knowledge is relevant, *see Chase Lumber & Fuel Co. v. Koch* (*In re*

*Koch*), 197 B.R. 654, 658-59 (Bankr. W.D. Wis. 1996).   In sum, in order to establish that a

debt is non-dischargeable for reason of fraud or defalcation while acting in a fiduciary

capacity, the creditor must establish, by a preponderance of the evidence, the existence of an

-16-

express trust or a fiduciary relationship and a debt caused by the debtor's fraud or defalcation. *Grogan*, 498 U.S. at 291; *Woldman,* 92 F.3d at 547.

### 2. Express Trust or Fiduciary Relationship

The existence of an express trust or fiduciary relationship is tested under federal law standards. *Follett Higher Educ. Group, Inc. v. Berman (In re Berman)*, 629 F.3d 761, 767 (7th Cir. 2011); *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir. 2000). An express trust requires an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust. *Monroe*, 304 B.R. at 358. The intent to create a trust relationship is a key element in determining the existence of an express trust. *Id.*

A § 523(a)(4) cause of action can be based on a fiduciary relationship other than one arising from an express trust. *See Frain*, 230 F.3d at 1017; *In re Marchiando*, 13 F.3d 1111, 1115-16 (7th Cir.1994). "A fiduciary relationship may arise separate from an express trust, . . . but it is the substance and character of the debt relationship that determines whether such a fiduciary relationship exists." *Monroe*, 304 B.R. at 358. The Seventh Circuit has found that a fiduciary relationship exists for purposes of § 523(a)(4) when there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Marchiando*, 13 F.3d at 1116; *see also Woldman*, 92 F.3d at 547 ("[S]ection 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge. . . ."). For example, a lawyer-client relationship, a director-shareholder relationship, and a managing partner-limited partner relationship all require the principal to "'repose a special confidence in the fiduciary.'" *Frain*, 230 F.3d at 1017 (*quoting Marchiando*, 13 F.3d at 1116). However, not all fiduciary

-17-

relationships fall within the purview of § 523(a)(4). *Woldman*, 92 F.3d at 547. A fiduciary relationship qualifies under § 523(a)(4) only if it "imposes real duties in advance of the breach. . . ." *Marchiando*, 13 F.3d at 1116. In other words, the fiduciary's obligation must exist prior to the alleged wrongdoing. *Id.*

### 3. Embezzlement

Embezzlement under § 523(a)(4) has been defined as the "'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (*quoting Moore v. United States*, 160 U.S. 268, 269 (1895)). To prove embezzlement, the creditor must show: (1) the debtor appropriated the subject funds for his own benefit; and (2) the debtor did so with fraudulent intent or deceit. *Id.*; *Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 334 B.R. 392, 400 (Bankr. N.D. Ill. 2005); *Monroe*, 304 B.R. at 359. To demonstrate fraudulent intent, the creditor must show that there is an intent on the debtor's part to deprive him of his property. *Cohen*, 334 B.R. at 400 n.7. A fiduciary relationship or trust relationship need not be established in order to find a debt non-dischargeable by an act of embezzlement. *Pawlinski*, 170 B.R. at 390. Embezzlement differs from larceny only in that embezzlement requires that the original taking was lawful, or at least with the consent of the owner, unlike larceny, which requires that felonious intent exist at the time of the taking. *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 775 (Bankr. N.D. Ill. 2010).

### 4. Larceny

Larceny under § 523(a)(4) necessitates a showing that a debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to his own

-18-

use without the owner's consent. *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991); *Broholm*, 310 B.R. at 877; *Schaffer v. Dempster (In re Dempster)*, 182 B.R. 790, 802 (Bankr. N.D. Ill. 1995).

## IV. DISCUSSION

### A.     11 U.S.C. § 523(a)(2)(A)

In his post-trial written arguments, the Creditor makes three primary arguments: (1) that the Debtor failed to disclose that some proceeds of the Countryside loan were used to pay Prairie's debt to Palos; (2) that the Debtor represented that the Gables project lost money while taking "pre-paid profit"; and (3) that false sworn contractor's statements were submitted for "phantom expenses." The total financial impact of these allegations is summarized in "Table 2" to the Creditor's written closing arguments as funds the Creditor believes the Debtor should repay him. The Court will address each in turn.

The Creditor first argues that the Debtor failed to disclose to him that some of the proceeds of the Countryside loan were used to pay off Prairie's obligation to Palos. The Creditor testified that he knew nothing of the loan and was not told until he and his wife began investigating the Gables' finances in January 2008. He testified that he believed the amount of the loan over the purchase price of the real estate was to be used for construction related costs, not to pay off prior loans to which he was not obligated and that he would not have given consent if he had known. The Debtor testified that he had discussed the loan with the Creditor and that the Creditor was unhappy about it, but consented.

-19-

The Creditor's signature appears on the Disbursement Request and Authorization form for the Countryside loan which explains that Palos was to receive $970,140.47 and that $1,366,427.03 would be deposited in the Gables' bank account. (Debtor Ex. No. 14.) Whether or not the Creditor agreed to the arrangement, he was presumably aware that the disbursement to Palos was hundreds of thousands of dollars more than what the Gables owed on its acquisition loan. The Creditor has introduced no evidence that he was tricked into signing the Disbursement Request and Authorization form through any false representations or fraud on behalf of the Debtor. Moreover, the payment was listed as "Palos Loan Payoff" on the contractor's sworn statements. (Creditor Ex. No. 36.) This demonstrates that the Debtor and Prairie were, at the least, not attempting to hide the fact of the payment to Palos. The Creditor has failed to demonstrate that the $287,636.33 payment to Palos on behalf of Prairie constituted false pretenses, a false representation, or actual fraud.

The Creditor further argues that the Debtor or his agents submitted false contractor's sworn statements for materials and services and reimbursement of phantom expenses and costs. The Creditor asserts that the Debtor used the Gables' construction loan as a "corporate piggy bank" by falsifying costs and expenses at times when Prairie was in need of funds and that there are many questionable overcharges by Prairie for certain line items. For example, the Creditor argues that many of the invoices for "builder's cost" lack sufficient support. The Creditor bases this argument on the copies of checks that were attached to some invoices, but not all. The Creditor asserts that the difference between the amount charged and the support provided is $41,437.07. (*See* Creditor Closing Argument Tables 1 & 2.)

-20-

First, the Court notes that the Creditor does not distinguish between alleged representations by the Debtor and those by Prairie or Bohan. The Creditor admits that the sworn statements were submitted by Bohan on behalf of Prairie. The Creditor has not alleged a legal basis to hold the Debtor personally responsible for any alleged representations made by Bohan. Second, although certain of Prairie's invoices lacked attached checks, the Creditor has failed to demonstrate that the failure to attach checks was for any fraudulent purpose. There is no corroborating evidence that the invoices were falsified. Bohan simply could have forgotten to attach some of the checks. Therefore, the $41,437.07 "overcharge" of builder's cost in the Creditor's calculations fails to demonstrate any false representation or fraud on behalf of the Debtor.

Another alleged fraudulent charge is a $6,281.21 payment to FE Wheaton. A page attached to a waiver request form stated that it was to apply to "old outstanding invoices and finance charges that have been hanging around" and lists invoice numbers for what appear to be non-Gables projects. (Creditor Ex. No. 60, p. 48.) The invoice also states that current bills are being paid with that payout. It is impossible for the Court to discern what, if any, of the $6,281.21 payment is attributable to non-Gables projects. Furthermore, Candice testified that the page attached to the waiver request form could have been a mistake. Both Bohan and Candice testified that there was no commingling of Prairie's accounts or funds of the subject project with other projects for which Prairie was the general contractor.

If this was a representation by anyone, it was a representation by Candice on behalf Prairie, not by the Debtor. The Creditor does not even include this charge in its table of "overcharges" and "phantom costs" that he believes the Debtor should reimburse. (*See*

-21-

Creditor Closing Argument Tables 1 & 2.)  Therefore, the Court finds that the Creditor has

not demonstrated that the $6,281.21 payment was a false representation, false pretense, or

fraud on behalf of the Debtor.

The Creditor also argues that there was no documentation for a $59,883.00 charge

for hauling or $20,000 for sewer billed by Prairie to the Gables, and that Bohan was at a loss

to explain those charges as well as the builder's cost.  Moreover, the Creditor argues that

both the Debtor and Bohan testified that Prairie did not own a truck, did no hauling, and did

not have sewer construction equipment.  Like the failure to attach checks to certain invoices

for builders' costs, Prairie's lack of a truck for hauling or sewer equipment does not mean

that the Debtor fabricated the expenses.  Like most of the expenses billed to the Gables, the

hauling and sewer were more likely performed by sub-contractors, though it was listed on

the sworn statements as belonging to Prairie.  This error on the invoice does not demonstrate

that Prairie or, more importantly, the Debtor engaged in a "scheme" to obtain financing in

order "to maintain an extravagant lifestyle" as asserted by the Creditor.  (Creditor Closing

Argument p. 11.)  The Court finds this argument unconvincing and without corroborating

evidentiary support.

The Creditor finally alleges that the Debtor or his agents created spreadsheets

indicating disbursements to Prairie for "pre-paid profit" while representing to the Creditor

the Gables project lost money.  The Creditor's own testimony contradicts this argument.  At

trial, the Creditor most tellingly testified that the Debtor never made any fraudulent

statements to him during the course of the project and that he had no evidence of money

taken by the Debtor through fraud or misrepresentation regarding the project.  This is fatal

-22-

to the Creditor's claim under a fraud theory notwithstanding any justifiable reliance by the Creditor.  Nonetheless, Bohan testified that he created a spreadsheet captioned "Pre-Paid Profit."  The fact that the spreadsheet was so labeled is not dispositive, however.  Bohan testified that it was later changed and treated as a pre-paid general contractor fee because no profit was made.  The Debtor admitted that Prairie took pre-paid profit because Prairie needed funds to continue to operate.

The Creditor does not dispute that under the general contractor agreement Prairie was entitled to 15% of the cost of construction and, despite all of his arguments, the Creditor fails to show that Prairie took more than it was entitled to under that agreement or the Operating Agreement.  The Creditor's previous arguments that Prairie or the Debtor inflated or falsified invoices have already been rejected.  Moreover, the Creditor has failed to demonstrate that the Gables ever made a profit to split between Prairie and himself.  The evidence indicates that the Gables experienced numerous financial woes during the construction of the project, including a lawsuit with a prospective purchaser that resulted in substantial legal fees and a $24,000 settlement, plus substantial interest paid on the construction loans, and delays in construction from the lack of available financing.

Based on the foregoing, the Court finds that the Creditor has failed to demonstrate by a preponderance of the evidence any false representations, false pretenses, or fraud on behalf of the Debtor.  The Creditor's § 523(a)(2)(A) claim is rejected.

### B.    11 U.S.C. § 523(a)(4)

In the Creditor's written closing arguments, he seeks to strike Count II under § 523(a)(6) and amend the complaint to conform to the proofs presented at trial to include a

-23-

claim under § 523(a)(4). The Debtor argues that the Creditor failed to file a proper motion to amend the complaint. Although the Creditor did not make a separate motion to amend the complaint, the Court will consider the § 523(a)(4) claim based on the evidence presented at trial and will not address the claim under § 523(a)(6).

While the Creditor states that he wants to recharacterize his claim under § 523(a)(4), he fails to make any arguments whatsoever with respect to the elements of that claim. Perfunctory and undeveloped arguments that are unsupported by pertinent authority are waived. *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010). The Court does not have a duty to research and construct legal arguments available to a party. *See Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995). Moreover, a litigant who fails to support a request with pertinent authority forfeits that request. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921 (7th Cir. 1997); *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1991). Therefore, the Court will not make the Creditor's arguments for him and will address only the evidence presented.

The Court notes that the Creditor presented no evidence and developed no argument that the Debtor owed him a fiduciary duty under *Marchiando*, which is a requirement to prove fraud or defalcation under § 523(a)(4). The general contractor agreement was between the Gables and Prairie and none of its terms or the relationships under the agreement established the requisite fiduciary relationship by which the Debtor was acting in a fiduciary capacity as to the Creditor. Although under the Operating Agreement between the Creditor and Prairie the Debtor was designated manager and thus within the scope of a fiduciary under *Marchiando*, there is no preponderance of evidence to establish that the Debtor committed

-24-

fraud, defalcation, embezzlement, or larceny.  More importantly, as discussed above, the

Creditor admitted that the Debtor did not fraudulently appropriate or wrongfully take any of

the Gables' funds.  In fact, the Creditor did not show that Prairie took any funds above the

amount to which it was entitled.  As such, the Creditor's claim under § 523(a)(4) is rejected.


## V.  CONCLUSION

For the foregoing reasons, the Court finds that the Creditor has not demonstrated all

of the elements under §§ 523(a)(2)(A) and (a)(4), and that, thus, the debt is dischargeable

under those statutory exceptions.

This Opinion constitutes the Court's findings of fact and conclusions of law in

accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate order shall be

entered pursuant to Federal Rules of Bankruptcy Procedure 5003 and 9021.


ENTERED:

DATE: ___9/14/11___

_____
John H. Squires
**United States Bankruptcy Judge**


cc:     See attached Service List

## SERVICE LIST

### David J. Zitt v. Daniel J. Roberts
**Adversary No. 10 A 01298**

William D. Cherny, Esq.
Kuhn, Mitchell, Moss, Mork &
Lechowicz, LLC
111 E. Jefferson Avenue
Naperville, IL 60540

David E. Grochocinski, Esq.
Grochocinski Grochocinski & Lloyd, Ltd.
1900 Ravinia Place
Orland Park, IL 60462

Konstantine Sparagis, Esq.
Babak Bakhtiari, Esq.
Law Offices of Konstantine Sparagis
8 S. Michigan Avenue, 27th Floor
Chicago, IL 60603

Patrick S. Laying, United States Trustee
219 S. Dearborn Street
Suite 873
Chicago, IL 60604